**UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF FLORIDA**

**TAMPA DIVISION**

ASHTON ABRAHAM and
BRYAN ABRAHAM,

CASE NO: 8:26-cv-3288

Plaintiffs,

v.

COOPERSURGICAL, INC.,

Defendant.
_____________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, ASHTON ABRAHAM and BRYAN ABRAHAM[1] respectfully bring this Complaint against Defendant, COOPERSURGICAL, INC. ("CooperSurgical") and hereby allege as follows:

**THE PARTIES**

1. Plaintiffs, Ashton Abraham and Bryan Abraham, are married individuals who reside in and are domiciled in Martin County, Florida, where they intend to remain indefinitely. Each Plaintiff is a citizen of the State of Florida for purposes of 28 U.S.C. § 1332.

[1] Respectively, "Mrs. Abraham" and "Mr. Abraham," and collectively, "Plaintiffs"; references to "Plaintiff" in the singular refer to Mrs. Abraham.

2. Defendant CooperSurgical, Inc is a Delaware corporation with its principal place of business in Trumbull, Connecticut. For purposes of 28 U.S.C. § 1332(c)(1), CooperSurgical is a citizen of Delaware and Connecticut.

3. CooperSurgical describes itself as the "leading fertility and women's health company dedicated to putting time on the side of women, babies, and families at the healthcare moments that matter most in life."[2] It has quickly acquired other In-Vitro Fertilization ("IVF") and reproductive health companies. In April 2018, CooperSurgical acquired the assets of The LifeGlobal Group and its affiliates, a leading global provider of IVF devices, for $125 million.[3]

## JURISDICTION AND VENUE

4. This Court has specific personal jurisdiction over CooperSurgical under Florida's long-arm statute, § 48.193(1)(a)(1), (2), and (6), as CooperSurgical operates, conducts, engages in, and carries on a business venture in Florida, including by selling and shipping Global Media to fertility clinics in Florida such as CNY Fertility's Sarasota laboratory.

5. CooperSurgical committed a tortious act within Florida and caused injury to persons and property within Florida arising out of acts or omissions outside Florida while products it manufactured were used or consumed within Florida in the ordinary course of commerce.

---

[2] https://www.coopersurgical.com/about-us.

[3] https://www.globenewswire.com/news-release/2018/04/03/1459615/0/en/The-Cooper-Companies-Acquires-The-LifeGlobal-Group-Expanding-Fertility-Solutions-Portfolio.html.

6. Plaintiffs' claims arise out of and relate to these Florida contacts.

7. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs are citizens of Florida, and CooperSurgical is not a citizen of Florida.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Specifically, the Global Media was used to culture Plaintiffs' embryos in Sarasota County, Florida, where the embryos were damaged. The Tampa Division is the division to which this action is most directly connected. *See* M.D. Fla. Local Rule 1.04.

## FACTUAL ALLEGATIONS

9. Plaintiff has dreamed her whole life of having children. When Plaintiff and her husband were married in January 2023, growing a family together was of the utmost importance to both of them and they began trying to conceive.

10. Even before she was married, Plaintiff changed nearly every aspect of her life to give herself the best possible chance of having a healthy pregnancy and child.

11. Plaintiff stopped drinking alcohol and coffee and eliminated food that could cause inflammation. She began a costly supplement regimen and stripped her home of potential endocrine-disrupting products, replacing candles, perfumes, laundry detergent, as well as skin and hair care products with unscented alternatives. She replaced every Teflon pot and pan in her kitchen with non-stick, non-toxic cookware.

For an entire year, she attended weekly acupuncture sessions for fertility. No detail was too small if it might help her become a mother.

12. When natural conception failed, Plaintiffs went to a fertility clinic in Jupiter, Florida in March of 2023.

13. Mrs. Abraham underwent an intra-uterine implantation ("IUI") procedure and became pregnant. Sadly, that pregnancy ended in miscarriage.

14. Plaintiffs tried two more rounds of IUI and both failed. The emotional toll was immense, compounded by the impossible financial burden.

15. Despite these setbacks, Plaintiffs refused to give up on their dreams of having biological children. Plaintiffs found CNY Fertility in Sarasota, Florida — an over six-hour roundtrip commute from her home— because it offered greater financial assistance to women who needed it. Mrs. Abraham believed IVF was her "one chance" to become a mother.

16. Leading up to her first cycle of IVF at CNY Fertility in September of 2023, Mrs. Abraham continued the rigorous lifestyle regimen described above.

17. During her egg retrieval at CNY Fertility on November 17, 2023, doctors retrieved fourteen (14) eggs, which developed into eight (8) embryos. Plaintiffs' joy was short-lived, however. In the days that followed, Plaintiffs' doctors called and relayed the bad news – none of Plaintiffs' embryos were developing into blastocysts the way they should.

18. Plaintiffs' doctor attempted a fresh transfer using the two (2) embryos that were closest to reaching the blastocyst stage. Sadly, the embryo transfer failed, and Mrs. Abraham did not become pregnant.

19. After the failed transfer, the embryologist told Plaintiffs that one (1) embryo had ultimately made it to the blastocyst stage. That single embryo from Plaintiffs' first round of IVF was frozen.

20. Mrs. Abraham blamed herself and her own body for the failure of her first round of IVF, believing that despite everything she had done to prepare, it simply had not been enough. Plaintiffs were devastated.

21. On or about December 5, 2023, CooperSurgical issued a recall of three lots of Global Media, stating the recalled media does the opposite of its intended use, creating a "risk to health" due to "impaired embryo development prior to the blastocyst stage."

22. In January 2024, Plaintiffs' clinic informed them of the truth: the CNY Sarasota office had used a particular lot of CooperSurgical's embryo culture media that had since been recalled, to culture all of the embryos from Plaintiffs' failed first round of IVF.

23. The failure Mrs. Abraham had blamed on her own body had in fact been caused by CooperSurgical's defective product.

24. Upon learning the truth, Plaintiffs desperately tried to figure out how they could afford a second round of IVF. They scraped together every dollar they had

available to pursue a second round of IVF at CNY Fertility in Sarasota, Florida beginning at the end of January in 2024.

25. Prior to her second round of IVF, Mrs. Abraham underwent months of difficult and specific medical care, including but not limited to medically induced menopause and a protocol that required seven different antibiotics to help increase her chances of success in her second and last round of IVF— a process that was physically, mentally, and emotionally grueling.

26. As a direct result of the failure of her first round of IVF, Mrs. Abraham suffered bodily injury.

27. She was required to undergo a second course of ovarian stimulation through repeated hormone injections, a second surgical egg retrieval under sedation or anesthesia, months of medically induced menopause, and a simultaneous regimen of seven antibiotics, and powerful fertility medications and hormones that carry significant side-effects, together with the pain, bleeding, bruising, and other physical effects of those procedures.

28. Further, Mrs. Abraham had complications during her second egg retrieval, ultimately resulting in multiple doctors' appointments and an unexpected and frightening trip to the emergency room.

29. Plaintiffs' second cycle of IVF, using a non-recalled lot of culture media, produced five (5) viable embryos from twenty (20) eggs retrieved, compared with only one (1) blastocyst from the fourteen (14) eggs retrieved in the first cycle.

30. Mrs. Abraham subsequently underwent three (3) embryo transfers. The third transfer finally succeeded, and Plaintiffs' daughter was born in February 2025.

31. Today, Plaintiffs have three (3) embryos remaining: one (1) embryo from their first round of IVF, which was cultured using CooperSurgical's recalled Global Media, and two (2) viable embryos from their second round of IVF, cultured using unaffected media.

32. Mr. Abraham provided the sperm used to create the embryos at issue, and Plaintiffs jointly own all embryos created during both IVF cycles, including the embryos damaged and lost in the first cycle.

33. Plaintiffs jointly paid the costs of IVF treatment, travel, and the related expenses described herein.

34. Plaintiffs desperately want to give their daughter a sibling. However, Plaintiffs are terrified to pursue another round of embryo transfers.

35. After the passage of time, Mrs. Abraham's potential future pregnancy is now considered a "geriatric pregnancy." Plaintiffs further fear that they may have to use all three of their remaining embryos, including the one exposed to CooperSurgical's defective media, whose long-term viability and safety Plaintiffs can no longer trust, to achieve another successful pregnancy.

36. Even if there is a successful implantation and development of Plaintiffs' third embryo, Plaintiffs reasonably fear birth defects may result from exposure to CooperSurgical's defective culture media.

37. Plaintiffs are severely traumatized by their past experiences with IVF. Mrs. Abraham knows that she cannot go through another round of IVF again—physically, emotionally, or financially.

38. Had CooperSurgical not manufactured and supplied defective embryo culture media during Plaintiffs' first round of IVF, based upon information and belief, Plaintiffs would not be facing this uncertain future today.

39. CooperSurgical manufactured, marketed, promoted, distributed, and/or sold embryo culture media that was intended to protect and nourish Plaintiffs' reproductive material and encourage development into healthy embryos.

40. CooperSurgical's manufacturing, marketing, promoting, distributing, and/or selling its defective media resulted in the impaired development of Plaintiffs' first-round of embryos and has caused irreparable damage to Plaintiffs.

41. Plaintiffs seeks damages and other remedies from CooperSurgical as a result of its misconduct.

**<u>In-Vitro Fertilization</u>**

42. IVF is an assisted reproductive technology ("ART") that requires surgically retrieving a woman's eggs and fertilizing them with sperm in a laboratory. The fertilized eggs, once developed into viable embryos, are then transferred into the woman's uterus in the hopes of carrying an embryo to full term.

43. To prepare for egg retrieval, women like Plaintiff must take hormones, injections, and other medications to help stimulate the body. These medications are taken orally and by way of injection which can cause bruising, swelling, and

discomfort and may also have other side effects, including but not limited to, fatigue, nausea, headaches, allergic reactions, blood clots, and emotional instability. Once an ovulation trigger injection is performed, women proceed to the egg retrieval phase, where they are sedated or placed under general anesthesia, and undergo insertion of a needle through the vaginal wall and into each follicle in the ovary to drain the follicles of their fluid. The fluid in the follicle is then extracted into a test tube and studied under a microscope to look for eggs.

44. Residual pain and bleeding typically occurs after an egg retrieval procedure which requires bed rest for several days.

45. Overall, the process is incredibly life shifting, uncomfortable, invasive, time consuming, and costly.

**<u>Embryo Culture Media (Global Media)</u>**

46. Typically, the male partner provides a sperm sample on the same day as the female partner's egg retrieval. Thereafter, the eggs are fertilized with the sperm and immersed in embryo culture media, usually in a petri dish, to develop into embryos, all which occurs in a laboratory setting.

47. Specifically, in this situation the fertilized egg was immersed in Global Medial manufactured by CooperSurgical at this stage of the process.

48. Once a fertilized egg divides, it becomes known as an embryo. Embryos are cultured in culture media, specifically here in CooperSurgical's Global Media, for approximately five to seven days to develop to the blastocyst stage.

49. A cleavage embryo is an embryo at the stage of its development in which it is undergoing a series of cell divisions or cleavages. This stage begins about 24 hours after the egg is fertilized and lasts until the morula is formed around four days after fertilization.

50. A blastocyst is a cluster of dividing cells made by a fertilized egg. This is the early stage of an embryo. A blastocyst forms approximately five to six days after a sperm fertilizes an egg. Layers of cells in the blastocyst divide and separate. This is typically referred to as a "culturing phase" and during this time, the embryos are closely monitored.

51. By this point, the blastocyst has two distinct cell types—surface cells, called the trophectoderm, that will later develop into the placenta, and an inner cell mass, which will become the fetus.

52. The embryo culture media is critical to an embryo's successful development during this time. Culture media impacts an embryo's ability to develop into a healthy blastocyst, but also impacts future fetal development and perinatal outcomes, including gestational age and birthweight.

53. After the culture phase, embryos of good quality are then transferred into the woman's uterus ("fresh transfer") or frozen for future use ("frozen embryo transfer").

54. Developing embryos are incredibly sensitive and the environment where they develop is strictly controlled. For developing embryos, even the smallest of variations in the environmental conditions, can have devastating impacts on the

embryo, including, as Plaintiff experienced firsthand, a halt in development before the blastocyst stage.

55. Embryo culture media is an essential part of the development of embryos in the IVF process. These media, along with supplemented temperature and gas concentrations, mimic the conditions of the female reproductive tract to support fertilization and embryo development.

56. Culture media for embryo development must meet the metabolic needs of preimplantation embryos by providing necessary sources of energy, nutrients, and pH levels based on the specific developmental stage of the embryo. The specific nutrients in the media are thus crucial to an embryo's successful growth.

57. Embryo culture media is a complex solution composed of a basic salt/magnesium solution with the addition of other components, such as carbohydrates (pyruvate, lactate, and glucose) and amino acids, which together are the main energy sources of the developing embryo.

58. Magnesium is a critical component and an essential element of embryo culture media, and a lack of magnesium such as with CooperSurgical's Global Media will result in the destruction or arrested development of human embryos.

**The Unique and Precious Nature of Human Embryos**

59. CooperSurgical is aware of the lengths to which families go to extract eggs and create embryos, their emotional and financial investment in the survival of their embryos, and their expectations that their embryos will be handled with care to avoid

irreparable, devastating harm.

60. Embryos are precious. They offer the opportunity to fulfill a fundamental human desire: to become a parent and start a family. Reproductive material has immense emotional and personal value.

61. Embryos are also irreplaceable. Human eggs, also known as oocytes, are a limited resource. A woman has about one million eggs at birth and this supply diminishes at a rate of about 1,000 eggs per month. This decline is part of the natural aging process and is commonly referred to as a woman's biological clock. The loss of oocytes from the ovaries continues in the absence of menstrual cycles as well as when women are pregnant, nursing, or taking oral contraceptives. Egg quality diminishes with time, with miscarriages and chromosomal abnormalities occurring more frequently for older women.

62. The most determinative factor in IVF success is the woman's age at the time her eggs were extracted. At some point, usually around her mid-40s, a woman can no longer produce viable eggs. If a couple is unable to transfer their preserved embryos it might be too late to go through another round of IVF, thereby making it impossible to get pregnant and start a family.

63. The success or failure of creating healthy embryos through IVF has substantial emotional and psychological ramifications for those seeking to become parents. Losing embryos provokes fear, devastation, and despair. Many experience grief and anguish when fertility treatment does not result in pregnancy or when their fertility choices diminish.

64. The loss or improper development of embryos naturally results in serious

emotional harm to hopeful parents. Families undergoing IVF entrust their embryos to physicians and manufacturers such as CooperSurgical. These hopeful parents invest the most precious parts of who they are, their reproductive material, which is their most valuable and irreplaceable property. Emotional distress stemming from embryo loss or damage is thus predictable.

**CooperSurgical's Role in the IVF/ART Market**

65. CooperSurgical has positioned itself as a leader in the field of reproductive health and infertility treatment.

66. Defendant CooperSurgical describes itself as "the global leader in IVF and reproductive genetics, providing innovative products and services for every step in the ART journey. Our company vision is a world with healthy women, babies and families."[4]

67. CooperSurgical boasts its ability to provide "unique solutions at every step of the ART cycle" and "industry-leading ART innovation."[5] CooperSurgical claims to offer "effective solutions that support clinical efficiency and engaged and supported patients. All to conceive, deliver, and protect healthy babies."[6]

68. CooperSurgical's mission states that it is a "leading fertility and women's health company dedicated to putting time on the side of women, babies, and families at the healthcare moments that matter most in life."[7]

69. CooperSurgical participates in symposiums and expos regarding IVF-related

[4] https://fertility.coopersurgical.com/about-us/.
[5] https://fertility.coopersurgical.com/about-us/.
[6] https://www.coopersurgical.com/healthcare-providers/fertility-birth.
[7] https://www.coopersurgical.com/about-us.

topics.[8] For example, CooperSurgical was a platinum-level sponsor for the American Society for Reproductive Medicines 2023 Scientific Congress & Expo.[9]

70. As the designer, manufacturer and supplier of IVF products, the emotional concerns of CooperSurgical's consumers, like Plaintiffs, are the essence of its work, as the very materials manufactured by CooperSurgical play a critical role in the highly personal and emotionally-laden process of conceiving a child through IVF.

71. CooperSurgical recognizes the incredible value of the reproductive material that its products are designed to grow and safeguard.

72. There are very few manufacturers of products for use in ART laboratories. CooperSurgical operates in a very niche market. In this small and highly specialized space, CooperSurgical is, upon information and belief, one of the largest manufacturers of ART products. Very few companies provide similar products, and these other companies are much smaller than CooperSurgical.

73. Further, CooperSurgical works very closely with IVF laboratories to provide IVF products to families, like Plaintiffs, who are desperately hoping to have a healthy baby.

74. Indeed, on its public website, CooperSurgical includes patient testimonials from families struggling with infertility.[10]

75. For example, one testimonial on CooperSurgical's website describes the

---

[8] https://fertility.coopersurgical.com/session/symposiums/.
[9] https://asrmcongress.org/.
[10] https://www.coopersurgical.com/patients/patient-article-list/?refinementList%5Blifestage%20name%5D%5B0%5D=I%20want%20kids&refinementList%5Bcondition%20name%5D%5B0%5D=Infertility%20%26%20IVF&page=2.

experience of an embryologist facing infertility and undergoing IVF.[11] This testimonial recognizes the "incredible struggles that IVF patients go through," the "hysterics" that can arise from unexpected events in the IVF process, and the "devastation," "confusion," and "stress" that often arises during one's IVF journey.[12] The embryologist writes, "I look at every single embryo with awe about what it is capable of. I think about how my babies started from a little bundle of cells just like them. [. . .] I know how it feels to get that positive pregnancy test, to feel a baby grow inside me, the excitement of packing a hospital bag, setting up a nursery and bringing a baby home. I want this for every single person that I know is trying for a baby."[13]

76. CooperSurgical's website states, "At CooperSurgical, we understand the struggles that families facing infertility go through. Families #deservetoknow they are not alone, and that their family, friends, and CooperSurgical are here for them every step of the way."[14]

77. CooperSurgical's website provides greeting cards for families going through infertility to "help spread the message of support and empathy for families in need."[15] CooperSurgical writes, "Thank you for your continued support as we work to create a more compassionate and understanding world for families facing infertility."[16]

---

[11] https://www.coopersurgical.com/patient-article/an-embryologists-journey-to-conceive-while-helping-others-on-the-same-path.
[12] *Id.*
[13] *Id.*
[14] https://www.coopersurgical.com/patient-article/our-greeting-card-initiative-is-here-to-send-a-message-about-infertility.
[15] *Id.*
[16] *Id.*

78. CooperSurgical recognizes that it engages in a peculiarly sensitive and emotional business by manufacturing and supplying IVF products used by families, like Plaintiffs' family, who face barriers to conceiving a healthy child.

**<u>CooperSurgical's Defective Global Media</u>**

79. CooperSurgical manufactures and markets multiple lines of "cutting-edge ART culture media for IVF procedures," one being the CooperSurgical LifeGlobal global® Media (or Global Media).[17] These products are advertised as "[c]reating the optimal environment for human embryology procedures."[18]

80. CooperSurgical's Global Media is advertised by CooperSurgical as "the original single-step, protein-free medium for uninterrupted embryo culture."[19] The media "[c]ontains energy substrates and essential amino acids to support embryo growth and development."[20]

81. CooperSurgical advertises that its products "undergo thorough quality testing before being released, to ensure consistent quality for your piece of mind."[21] It alleges that its "focus on quality at every level of our operations is audited and confirmed by our notified bodies, that delivers quality certificates."[22]

82. Specifically, CooperSurgical advertises that the performance of the Global Media "has been demonstrated through 15 years of use and 500 independent publications

---

[17] https://fertility.coopersurgical.com/art-media-products/culture-media-for-ivf-procedures/.
[18] https://fertility.coopersurgical.com/culture-solutions/.
[19] https://fertility.coopersurgical.com/art_media/global/#toggle.
[20] *Id.*
[21] *Id.*
[22] https://www.coopersurgical.com/healthcare-providers/support-compliance/quality-certifications.

using global medium."[23]

83. Yet, on December 5, 2023, CooperSurgical issued an Urgent Media Recall: Field Safety Notice[24] (the "Recall Notice") regarding certain lots of the Global Media (part numbers LGGG-100, LGGG-050, and LGGG-020; lot numbers 231020-018741, 231020-018742, and 231020-018743 (the "Recalled Lots")).

84. The Recall Notice states "CooperSurgical has become aware of a sudden increase in complaints regarding the aforementioned lots of this product" and identifies that "[t]he risk to health is impaired embryo development prior to the blastocyst stage." This is precisely the failure Plaintiffs experienced with their embryos during their first round of IVF.

85. In an updated version of the Recall Notice, CooperSurgical acknowledged that magnesium, an essential ingredient, had not been added to the Recalled Lots during formulation.[25]

86. On or about February 14, 2024, the U.S. Food and Drug Administration posted a Class II recall of the same three Recalled Lots, identifying the risk as impaired embryo development before the embryos could become viable for transfer.

87. The Global Media reached CNY Fertility in Sarasota, Florida in a sealed condition, and CNY Fertility used it to culture Plaintiffs' embryos without altering or

[23] https://fertility.coopersurgical.com/art_media/global/#toggle.
[24] https://www.lieffcabraser.com/pdf/Cooper_Recall_Notice.pdf.
[25] https://www.lieffcabraser.com/pdf/coopersurgical-corrective-action-info.pdf

modifying it. The Global Media was therefore in the same condition when it was used on Plaintiffs' embryos as when it left CooperSurgical's possession and control.

88. On information and belief, CooperSurgical did not properly test or inspect the impacted lots of Global Media until after receiving numerous complaints from fertility clinics that embryos cultured in CooperSurgical's Global Media were dying at elevated rates.

89. As a leading manufacturer and supplier of IVF products, including embryo culture media, CooperSurgical knew or should have known that if the Global Media was contaminated, manufactured improperly, or lacked particular elements, that it could destroy human embryos upon contact, prevent the proper and healthy development of human embryos, have significant and adverse consequences for the survival outcome of embryos, and/or harm the children that may potentially result from those embryos exposed.

90. Accordingly, CooperSurgical knew it was imperative that its culture media be properly assembled, composed, tested and/or inspected prior to the distribution of such media.

91. Despite this, CooperSurgical failed to properly inspect, assemble, compose, and/or test its culture media, including the Recalled Lots of Global Media. CooperSurgical knowingly put its culture media into the market when it knew or should have known that the Recalled Lots posed a substantial and unacceptable risk to human embryos, including Plaintiffs' embryos.

92. As described above, CooperSurgical knew that people go to extraordinary

lengths to obtain and use viable human embryos. CooperSurgical knew that people place an extremely high value on their embryos, make substantial physical, emotional, and financial investments for their embryos, and expect that great care will be taken to preserve and protect the embryos in order to avoid irreparable harm to their embryos.

93. CooperSurgical's conduct constituted gross negligence and intentional misconduct within the meaning of § 768.72(2), Florida Statutes. CooperSurgical knew that magnesium was an essential ingredient of the Global Media and that its absence would destroy or arrest the development of human embryos.

94. Nevertheless, on information and belief, CooperSurgical released the Recalled Lots without testing them for magnesium content, and after receiving complaints of failed embryo development, CooperSurgical did not promptly notify clinics or affected patients, in conscious disregard of and indifference to the safety and rights of persons like Plaintiffs.

95. Upon information and belief, CooperSurgical's officers, directors, managers and employees knowingly participated in, condoned, ratified and/or consented to this conduct.

96. On information and belief, CooperSurgical previously manufactured and sold numerous products used in ART, including other culture media, that were defective and sometimes recalled.[26]

---

[26] *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=198891#:~:text=CooperSurgical%2C%20Inc.&text=It%20has%20come%20to%20CooperSurgical's,for%20embryo%20culture%20and%20development.&text=An%20URGENT%3A%20VOLUNTARY%20MEDIA%20RECALL,23%20was%20sent%20to%20customers.

97. CooperSurgical did not immediately or adequately communicate the information contained in the Recall Notice to the public or to the broader IVF community, including to Plaintiffs and/or the fertility providers relying on CooperSurgical's product, leaving Plaintiff in despair for months believing that her own body — not CooperSurgical's defective media — was to blame for her failed first round of IVF.

98. CooperSurgical knew or should have known that magnesium is a critical component and essential element of embryo culture media, and that a lack of magnesium in the Global Media may result in the destruction or arrested development of human embryos.

99. Despite this, on information and belief, CooperSurgical failed to adequately monitor its manufacturing systems and processes, and allowed for the production of embryo culture media without ensuring that sufficient amounts of magnesium were included — with lasting consequences for Plaintiffs, who were forced to undergo an entire additional, grueling round of IVF, and who now live with the fear and uncertainty of a frozen embryo they do not trust in additional to the financial burden it places on Plaintiffs.

**COUNT I**
**STRICT PRODUCTS LIABILITY—MANUFACTURING DEFECT**

100. Plaintiffs incorporate by reference each paragraph as if fully set forth herein.

101. Mrs. Abraham asserts this Count for her bodily injury and resulting damages, and both Plaintiffs assert it for the loss of and damage to their jointly owned embryos and for their economic losses.

102. CooperSurgical manufactured, designed, tested, supplied, distributed, and/or sold embryo culture media, including the defective Global Media product which was used on Plaintiffs' embryos.

103. The Global Media contained a manufacturing defect when it left CooperSurgical's possession. This defect included, but is not limited to, the Global Media containing difference(s) in its chemical structure or composition and/or toxicity, such as a lack of sufficient levels of magnesium, such that it destroyed or hindered the development of human embryos upon contact, in addition to the other serious risks discussed above. Because of this defect, the Global Media was different from its intended design and failed to perform as safely as the intended design would have performed.

104. Lack of sufficient levels of magnesium in human embryos cultures is unreasonably dangerous as it has proven to lead to hinderance of DNA repair, discontinuance of embryo growth, which leads to the stoppage of blastocyst development.[27]

---

[27] Yuko Komiya et al., *Magnesium and Embryonic Development,* MAGENES RES. (2014) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4207262/; Liyou An et al., *Magnesium is a critical element for competent development of bovine embryos,* THERIOGENOLOGY (2019) doi.org/10.1016/j.theriogenology.2019.08.015.

105. These defects impaired the development of Plaintiffs' embryos upon contact, causing all but one of their first-round embryos to fail to reach the blastocyst stage and resulted in a failed transfer and a wasted round of IVF.

106. CooperSurgical had constructive notice or knowledge, or in the exercise of reasonable care should have known, that the Global Media was dangerous and was defective in manufacture. Specifically, CooperSurgical knew or should have known through the exercise of reasonable care that the Global media could destroy and/or prevent the healthy development of embryos.

107. The Global Media was used in a manner and fashion as it was intended to be used.

108. As a result of CooperSurgical's conduct, Plaintiffs were harmed and suffered damages.

109. As a direct and proximate result of the defective Global Media, Mrs. Abraham suffered bodily injury, as described previously, pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, and Plaintiffs suffered the loss of and damage to their embryos and economic losses.

110. The defective nature of the Global Media was a legal cause of Plaintiffs' harm.

## COUNT II
## STRICT PRODUCTS LIABILITY—FAILURE TO WARN

111. Plaintiffs incorporate by reference each paragraph as if fully set forth herein.

112. Mrs. Abraham asserts this Count for her bodily injury and resulting damages, and both Plaintiffs assert it for the loss of and damage to their jointly owned embryos and for their economic losses.

113. CooperSurgical manufactured, tested, supplied, distributed, and/or sold the defective Global Media used on Plaintiffs' embryos.

114. Before Plaintiffs' embryos were cultured, CooperSurgical knew or, in the exercise of reasonable care, should have known that the Recalled Lots were defective and posed a risk of arresting embryo development, including through the release testing that CooperSurgical performed, or should have performed, on the Recalled Lots.

115. The potential risks of destroying and/or preventing the development of human embryos upon contact with CooperSurgical's culture media presented a substantial danger when the Global Media was used (or misused) in an intended or reasonably foreseeable way.

116. Neither CNY Fertility nor Plaintiffs could have recognized the defect before use, because the omission of magnesium was not visible and the Global Media arrived sealed.

117. The Global Media was defective and unreasonably dangerous when it left CooperSurgical's possession because it did not contain adequate warnings, including warnings concerning the risk of destroying and preventing the development of human embryos when used to culture human reproductive cells. The foreseeable risks of harm posed by the Recalled Lots could have been reduced or avoided by

reasonable testing prior to patent use, warnings or instructions, including a timely warning not to use the Recalled Lots, and the omission of such warnings rendered the Global Media not reasonably safe.

118. CooperSurgical failed to adequately warn or instruct consumers, including Plaintiffs and their treating clinic, of the potential risks of applying its defective Global Media to human embryos.

119. Had CooperSurgical provided an adequate warning to CNY Fertility before Plaintiffs' embryos were cultured, CNY Fertility would not have used the Recalled Lot to culture Plaintiffs' embryos, and Plaintiffs' injuries would have been avoided.

120. CooperSurgical had constructive notice and knew, or should have known in the exercise of reasonable care, that the Global Media was dangerous, had risks, was defective in manufacture, and would destroy and/or prevent the development of human embryos.

121. CooperSurgical knew or should have known that users may not have adequate quality control measures in place to detect the dangers of the Global Media before applying it to reproductive cells, and CooperSurgical failed to adequately warn or instruct concerning the potential risks of applying the Global Media to reproductive cells when a reasonable manufacturer, distributor, or seller under similar circumstances would have warned of the danger or instructed in the safe use of the culture media.

122. It was foreseeable to CooperSurgical that the failure to adequately warn about the risks of the defective Global Media would cause irreparable harm, including the emotional distress and self-blame suffered by Plaintiff during the months she did not know the true cause of her failed first round of IVF. Mrs. Abraham's emotional distress flows from and accompanies the bodily injury described previously.

123. As a direct and proximate result of CooperSurgical's failure to adequately warn, Plaintiffs were harmed and suffered damages.

## COUNT III
## NEGLIGENCE

124. Plaintiffs incorporate by reference each paragraph as if fully set forth herein.

125. Mrs. Abraham asserts this Count for her bodily injury and resulting damages, and both Plaintiffs assert it for the loss of and damage to their jointly owned embryos and for their economic losses.

126. CooperSurgical produced, manufactured, assembled, sold, supplied and/or otherwise placed the defective Global Media into the stream of commerce, or maintained and inspected the Global Media, and owed a duty of care to consumers, such as Plaintiffs, as a result.

127. CooperSurgical knew or reasonably should have known that the Global Media needed to be produced, manufactured, assembled, maintained, inspected, sold and supplied properly, without defects and with due care, for consumers to use during the IVF process and to safely test embryonic matter.

128. CooperSurgical knew or should have known that any changes in the Global Media could destroy or prevent the development of human embryonic cells when used for embryo culture.

129. CooperSurgical was negligent, careless, in reckless disregard of the rights and safety of persons like Plaintiffs, and failed to take the care and duty owed to Plaintiffs, thereby causing damages and harm.

130. As manufacturers of culture media for use with human embryos, CooperSurgical owed a duty to consumers, including to Plaintiffs, to manufacture, inspect, and/or test its media to ensure it was properly formulated and contained the ingredients necessary for embryonic development, including but not limited to sufficient levels of magnesium.

131. Specifically, CooperSurgical negligently produced, manufactured, assembled, supplied, maintained, tested and/or analyzed the Global Media by producing, assembling, supplying, and/or failing to warn or correct through inspection, maintenance, monitoring, testing, and analysis that the Global Media with multiple flaws in manufacture, including, but not limited to: an embryo culture media that would destroy or prevent the development of the cells upon contact. Such conduct constituted gross negligence and intentional misconduct within the meaning of § 768.72(2), Florida Statutes.

132. The negligence, recklessness, and extreme carelessness of CooperSurgical includes, but is not limited to, the following:

a. Failure to use reasonable care in the production of the Global Media used on and applied to Plaintiffs' fertilized eggs;

b. Failure to use reasonable care in the manufacture of the Global Media used on and applied to Plaintiffs' fertilized eggs;

c. Failure to use reasonable care in the assembly of the Global Media used on and applied to Plaintiffs' fertilized eggs;

d. Failure to use reasonable care in supplying the Global Media used on and applied to Plaintiffs' fertilized eggs;

e. Failure to reasonably and properly test and analyze the testing of the Global Media under reasonably foreseeable circumstances;

f. Failure to warn consumers/customers about the dangers associated with use of the Global Media, specifically that it would destroy and/or prevent the development of human embryos upon contact;

g. Failure to utilize proper materials and components in the manufacture of the Global Media to ensure it would not destroy and prevent the development of human embryos upon contact;

h. Failure to use due care;

i. Failure to take necessary steps to modify the Global Media;

j. Having undertaken a recall of the Recalled Lots, failure to conduct it promptly and with reasonable care;

k. Failure to properly manufacture, assemble, sell, distribute, supply, repair, and/or modify the Global Media; and

l. Failure to maintain safety systems and/or procedures to ensure that the Global Media would operate properly and safely culture human embryos.

133. CooperSurgical's lack of care is an extreme departure from what a reasonably careful entity would do in the same situation and constitutes negligence.

134. Plaintiffs sustained damages as a result of CooperSurgical's negligence.

135. CooperSurgical's negligence foreseeably damaged Plaintiffs.

136. CooperSurgical explicitly and intentionally is involved in the business of manufacturing products for the culture of human embryos in IVF laboratories, and knows the sensitive and emotional nature of the IVF procedures for which its products are designed and used.

137. CooperSurgical further knew that Plaintiff would be particularly vulnerable to emotional distress and other harms, such as an inability to grow her family as planned, if the culture of her fertilized eggs failed due to CooperSurgical's faulty product.

138. Plaintiffs' embryos were unique property of profound personal value and no market value. CooperSurgical's destruction of that property through its grossly negligent conduct as alleged herein entitles Plaintiffs to recover for the mental anguish and emotional distress caused by its loss, in addition to the damages flowing from Mrs. Abraham's bodily injury.

139. As a direct and proximate result of CooperSurgical's negligence, Mrs. Abraham suffered bodily injury, resulting pain and suffering, mental anguish, emotional distress, and loss of enjoyment of life, and Plaintiffs suffered the loss of and damage to their embryos and economic losses.

**COUNT IV**
**VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FLA. STAT. §§ 501.201 *ET SEQ.*)**

140. Plaintiffs incorporate by reference each paragraph as if fully set forth herein. Plaintiffs assert this Count solely for economic loss.

141. CooperSurgical's advertising, marketing, promotion, sale, and distribution of Global Media to fertility clinics in Florida, including CNY Fertility's Sarasota laboratory, constitute "trade or commerce" within the meaning of § 501.203(8), Fla. Stat.

142. Plaintiffs paid CNY Fertility for IVF treatment that included embryology laboratory and embryo culture services, in which the Global Media was used to culture Plaintiffs' embryos during their first IVF cycle. A portion of the amount Plaintiffs paid was attributable to those embryology and culture services and the Global Media used in them.

143. Plaintiffs are "consumers" within the meaning of § 501.203(7), Fla. Stat., and are persons who have suffered a loss as a result of a violation of Florida's Deceptive and Unfair Trade Practices Act within the meaning of § 501.211(2), Fla. Stat. (the "FDUTPA").

144. Global Media entered into the stream of commerce throughout Florida.

145. Global Media was defective upon its entry into Florida.

146. At all pertinent times, Defendant engaged in deceptive trade practices, in violation of FDUTPA, Fla. Ann. Stat. §§ 501.201 *et seq*.

147. Florida has enacted statutes to protect consumers from deceptive, fraudulent, and unconscionable trade and business practices occurring out of Florida. Defendant violated these statutes, including by representing that the Global Media was fit to be used for the purpose for which it was intended, when Defendant knew or should have known the Global Media was defective and dangerous, in the

manufacturing, distributing, marketing, promoting, and sale of the Global Media in the following ways:

a. Through the labeling, instructions for use, certificates of analysis, and marketing materials for the Global Media, making affirmations of fact and promises about the product, including that it "[c]ontains energy substrates and essential amino acids to support embryo growth and development," that Defendant's products "undergo thorough quality testing before being released, to ensure consistent quality," and that its performance "has been demonstrated through 15 years of use and 500 independent publications."[28]

b. Knowing and intending that the Global Media would be used to culture the embryos of specific IVF patients, like Plaintiffs and that those patients and their embryos were the reason for the purchase, that the patients (not the clinic), would bear the consequences of any defect. Defendant also directed its representations about the Global Media to patients, including through the patient-facing pages of their website described herein.

c. Knowing that magnesium was an essential ingredient of the Global Media and that its absence would destroy or arrest the development of human embryos but nevertheless, on information and belief, releasing the Recalled Lots without testing them for magnesium content, and after receiving complaints of failed embryo development, not promptly notifying clinics or affected patients, in conscious disregard of and indifference to the safety and rights of persons like Plaintiffs.

d. Otherwise engaging in practices that are unfair and/or deceptive to consumers, including Plaintiffs.

148. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiffs suffered actual damages within the meaning of § 501.211(2), Fla. Stat., measured by the difference between the market value of the Global Media and the embryology and culture services as delivered and their value as represented. Because the recalled lot of Global Media used to culture Plaintiffs'

[28] https://fertility.coopersurgical.com/art_media/global/#toggle

embryos could not perform its intended purpose and was therefore worthless, Plaintiffs' actual damages equal the full amount they paid for the embryology and culture services and the Global Media in their first IVF cycle, in an amount to be proven at trial.

149. Pursuant to §§ 501.2105 and 501.211(2), Fla. Stat., Plaintiffs are also entitled to recover their reasonable attorney's fees and court costs incurred in bringing this Count.

## COUNT V
## LOSS OF CONSORTIUM

1. Plaintiffs incorporate by reference each paragraph as if fully set forth herein.

2. At all material times, Mr. Abraham and Mrs. Abraham were, and they remain, lawfully married.

3. As a direct and proximate result of the defective Global Media and CooperSurgical's conduct described above, Mrs. Abraham suffered bodily injury, as described previously.

4. Mrs. Abraham's injuries also deprived Mr. Abraham of the companionship, comfort, and society of their marriage. After the first IVF cycle failed, and until Plaintiffs learned in January 2024 that the failure had been caused by CooperSurgical's recalled Global Media, Mrs. Abraham blamed herself and her own body for the loss of their embryos. Her grief and self-blame, together with the physical

toll of the second IVF cycle that the defective media made necessary, diminished the companionship, comfort, and fellowship that Mr. Abraham shared with his wife

5. As a further direct and proximate result, Mr. Abraham has been deprived of, and will in the future be deprived of, his wife's services, comfort, society, companionship, and consortium, and has incurred expenses for her medical care and treatment.

## PRAYER FOR RELIEF AND DAMAGES TO ALL COUNTS

6. CooperSurgical's conduct was a direct, proximate, and producing cause of Plaintiffs' harm and damages, including but not limited to damages in the past and future for the following: bodily injury, pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, medical and pharmaceutical expenses, travel and travel-related expenses, lost wages, loss of consortium, and the loss of and damage to Plaintiffs' embryos.

WHEREFORE, Plaintiffs pray for judgment against CooperSurgical as follows:

a) That the Court award Plaintiffs' judgment against CooperSurgical for past and future economic and non-economic damages; including income, wages, and benefits.

b) That the Court award all such other sums as shall be determined to fully and fairly compensate Plaintiffs for all general, special, incidental and consequential damages incurred, or to be incurred, by Plaintiffs as the direct and proximate result of the acts and omissions of CooperSurgical;

c) Pre- and post-judgment interest at the highest rate allowed by law;

d) Punitive and/or exemplary damages; and

e) That the Court award such other and further relief as it deems necessary and proper in the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all issues triable by a jury.

Respectfully submitted on the 29th day of October, 2026.

*/s/ T. David Hoyle*
T. David Hoyle, FL Bar No. 55006
dhoyle@motleyrice.com
Kristen M. Hermiz, *Pro Hac Vice pending*
khermiz@motleyrice.com
Ann E. Rice Ervin, *Pro Hac Vice pending*
ariceervin@motleyrice.com
Jessica Crowder, *Pro Hac Vice pending*
jcrowder@motleyrice.com
Motley Rice, LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450